UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 1:23-CR-219 (DLF) |
| vs. | : | |
| | : | April 10, 2024 |
| LONG DUONG | : | |

### SENTENCING MEMORANDUM

Mr. Long Duong is scheduled to be sentenced on April 26, 2024.  In anticipation of his sentencing hearing, Mr. Duong respectfully requests that the Court impose a sentence of 12 months' probation and order restitution of $500 to the Architect of the Capitol.  As discussed below, Mr. Duong's history and characteristics, including his intellectual disability, weigh heavily against the need for prison.  That said, he understands there will be consequences and is ready to accept them.

I.     **The History and Characteristics of Long Duong[1]**

Long Duong was born in August 1968 in South Vietnam during the height of the Vietnam War, when the American presence in Vietnam peaked at more than 500,000 U.S. military personnel.  *See* Draft PSR ¶ 59.  Long's father Thomas Waldera was a white American Army infantry officer, and Long's mother Quit Duong was a local Vietnamese woman who met Lieutenant Waldera while delivering ice to his division.  *See ibid.*  Long has never met his father, despite several attempts to locate him.  *See ibid.*

---

[1] Long is intellectually disabled and is an imperfect historian.  In preparing the following factual account of Long's life, undersigned counsel relied in part on numerous primary and secondary documents as well as collateral interviews with many of Long's family members, including his mother Quit Duong, half-siblings Minh Duong, Nga Le, Quoc Le, and HongHoa Le, and children Jessica Nguyen and Jonathan Duong.

Long's mother Quit had six other children, all of whom are ethnically full Vietnamese. *See id.* ¶ 63. The family lived together in a single-room house consisting of a concrete floor, concrete walls, and a leaky corrugated aluminum roof. The family struggled with extreme poverty and food insecurity. They mainly lived off rice and water and were rarely able to have protein. When there was no rice, they would boil watercress.

Long Duong and his co-defendant share a unique identity: Both are Amerasian, born in Vietnam to a Vietnamese mother and a white U.S. military father. "By some estimates, tens of thousands of American servicemen fathered children with Vietnamese women during that long war. . . . After the war, those children – known as Amerasians – endured harsh discrimination and abject poverty in Vietnam, viewed as ugly reminders of an invading army." James Dao, *Vietnam Legacy: Finding G.I. Fathers, and Children Left Behind*, N.Y. TIMES (Sept. 15, 2013) https://www.nytimes.com/2013/09/16/us/vietnam-legacy-finding-gi-fathers-and-children-left-behind.html.

"These war babies . . . were called names like 'children of the dust' and 'half breeds.' Many of them were abandoned by their mothers – dropped off at orphanages or even thrown into trash cans – amidst fears they would be attacked by the Communist government." Samantha Raphelson, *One Man's Mission to Bring Home 'Amerasians' Born During Vietnam War*, NPR (July 12, 2018), https://www.npr.org/2018/07/12/628398153/one-mans-mission-to-bring-home-amerasians-born-during-vietnam-war. "Many Amerasians grew up destitute and were dismissed as 'bụi đời' ('the dust of life'). They were persecuted by the Communists because of their mothers' involvement with the enemy . . . ." Lucy Popescu, *Dust Child – The Stigmatised Offspring of the Vietnam War*, FINANCIAL TIMES (Apr. 21, 2023) (reviewing Nguyễn Phan Quế Mai, DUST CHILD (2023)), https://www.ft.com/content/88da9909-2f72-425a-a696-634ab2846e52.

Long's mother Quit Duong described her son's underclass status as Amerasian to the defense team as follows: "Amerasian child hang around the streets, they don't like Amerasian boy – they thought the mother was prostitution. People thought I was a prostitute. A big problem for us." Long's brother Quoc described how other children would call Long "the terror" and use "bad words to call you names" even making up songs to describe "you and how you are – the kid left behind – half this and half that." Long's brother Quoc explained that the "whole country" belittled Amerasians, and that many Amerasians "carry that [hurt] out . . . over from Vietnam, and they get in trouble."

Long's low social status as an Amerasian, "war child," or "child of dust" contributed to frequent abuse from his closest family members from a very young age. Long was "physically and verbally abused by his mother, stepfather (Thanti Le), and half-siblings" and "his mother fed him little food." *See* Draft PSR ¶ 60. Long recalls that his mother treated him differently from his siblings and that she frequently targeted him for physical abuse. He remembers his mother banging his head against the cement wall in their home when he was as young as 5. Long's alcoholic stepfather Thanh Le and half-siblings also "never accepted him since the defendant was half-American." *See ibid.* Long's six half-siblings, like Long, also suffered from exposure to war, extreme poverty, and food insecurity, but Long's upbringing was especially traumatic due to the additional abuse he suffered because of his mixed-race status. *See ibid.*

In 1975, when Long was 6 years old, the Vietnam War ended, with a defeat for Americans and threats of reprisal for South Vietnamese who had supported South Vietnam's wartime government or consorted with the enemy. After the war ended, the United States imposed a trade embargo on Vietnam, cutting off Vietnam from American exports and imports and those of other nations that bowed to American pressure. The United States also pressured other international

3

bodies to deny assistance to Vietnam.  In the late 1970s and early 1980s, Vietnam's economic performance was dismal, and Vietnam was one of the poorest countries in the world.

Because Long's mother could not afford to care for all seven children, and because she chose to prioritize the care of the three children she shared with her husband, Thanh Le, she often sent her three older children (by fathers other than Le) to live with other relatives.  Long's mother sent Long and his brother Minh to live with their maternal grandmother in Thủ Đức for a time. *See ibid.*

When Long was approximately 11 years old, he ran away from home, traveled to the city, and lived on the street "for a long time."  *See ibid.*  Long recalls working for a street vendor who cooked and served food, and recalls that his duties included serving food, carrying items for the cook, and washing pots and dishes.  *See ibid.*  While homeless, Long was "physically abused by strangers."  *See ibid.*  For Amerasian children in post-war Vietnam, often "[t]heir destiny was to become waifs and beggars, living in the streets and parks of South Vietnam's cities . . . ."  David Lamb, *Children of the Vietnam War*, Smithsonian Mag. (June 2009), https://www.smithsonianmag.com/travel/children-of-the-vietnam-war-131207347/.

Long never attended school while living in Vietnam.  *See* Draft PSR ¶ 76.  When asked about Long's schooling by the defense team, his mother replied:  "Didn't want any children to go to school.  That's why.  I have too many children I don't have enough money to buy food for them how can they go to school?"  Long's brother Quoc suggested that Amerasians from his generation were not likely to be educated:  "Half race . . . people making fun of you . . . I don't think you have a mind to sit in the classroom.  [There is] no one to guide you.  Everyone is trying to survive." As a result of his lack of schooling, Quoc said, Long "definitely developed more slowly for sure."

Incredibly, the racial identity that made Long's childhood so miserable turned out to be a

4

golden ticket for his family.  Amerasians like Long "began to be resettled in the United States [as refugees] after Representative Stewart B. McKinney of Connecticut called their abandonment a 'national embarrassment' in 1980 and urged fellow Americans to take responsibility for them." Lamb, *supra*.  Ultimately, because Long had an American father, Long and his family were able to leave Vietnam, which they did in approximately April 1985.  The family spent months at a refugee camp in Thailand and at the Philippine Refugee Processing Center (PRPC) in the Philippines, before arriving in the United States in February 1985.  *See* Draft PSR ¶ 65; Lamb, *supra* ("For a decade, the Philippines had been sort of a halfway house where Amerasians could spend six months, learning English and preparing for their new lives in the United States.").



*15-year-old Long in 1984 before leaving Saigon*

5

Ironically, the family was able to leave Vietnam for the United States only because of the least valued among them, Long Duong.  The entire family of nine was able to come to the United States because Long's father was a U.S. citizen.  The family that consistently mistreated, abused, and rejected Long ultimately utilized his marginalized identity to their benefit.

Two years later, in December 1987, Congress would pass the Amerasian Homecoming Act, which allowed Amerasians to come to the United States as *immigrants*, not refugees.  A report by the U.S. General Accounting Office states that when the law was passed in 1987, it was estimated that 20,000 to 30,000 Amerasians and family members lived in the United States – but by 1994, more than 75,000 had moved to the United States.  *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO/PEMD-94-15, VIETNAMESE AMERASIAN RESETTLEMENT: EDUCATION, EMPLOYMENT, AND FAMILY OUTCOMES IN THE UNITED STATES at 1,2 (March 1994), *available at* https://www.gao.gov/products/pemd-94-15.

The Amerasian Homecoming Act was prompted by Congressional concern about how Amerasian children like Long were being treated in post-war, Communist Vietnam: *"Shamed by reports of their horrible living conditions, Congress enacted legislation in 1987 giving Amerasians special immigration status."*  Raphelson, *supra*. After the passage of the Amerasian Homecoming Act, "[t]he Amerasians who had been so despised in Vietnam had a passport—their faces—to a new life, and because they could bring family members with them, they were showered with gifts, money and attention by Vietnamese seeking free passage to America."  Lamb, *supra*.

Long (barely) missed out on the chance to come to the United States as a lawful immigrant, rather than as a refugee.  Still, he was able to provide his entire family (and their descendants) with a new life in America.  The family relocated to Massachusetts, where they were sponsored by St. Mary of the Hills Catholic Church in Boylston, Massachusetts.  They lived in a house provided

6

by Catholic Charities, for some time in a church, and eventually in the first of many apartments in Worcester, Massachusetts.

After moving to the United States, Long continued to suffer continuous verbal and physical abuse from his mother and stepfather in their new country. *See* Draft PSR ¶ 61. Long's stepfather was particularly abusive to Long when he drank, *see id.* ¶ 60, and Long recalls being kicked in the back by him. As in Vietnam, Long was still not fully accepted as either Asian or American in the United States. Whether in Saigon or Worcester, Amerasians "were unwanted children. In Vietnam, they weren't accepted as Vietnamese and in America they weren't considered Americans. They searched for love but usually didn't find it." Lamb, *supra*. Around this time Long attended a few months of the ninth grade, the only formal education that he experienced in his entire life. *See id.* ¶ 76.

After less than a year in the United States, Long, then approximately 17 years old, left the home due to continued abuse, and became homeless again, "living on the streets." *See id.* ¶ 61. Long was exposed to substance abuse, became addicted to drugs, and, while still a teenager, was convicted of a very serious crime. In all this, Long was not unique: "Amerasians were vulnerable to drugs, became gang members and ended up in jail. As many as half remained illiterate or semi-illiterate in both Vietnamese and English and never became U.S. citizens. . . . Mention Amerasians and people would roll their eyes and recite an old saying in Vietnam: Children without a father are like a home without a roof." Lamb, *supra*.

On April 7, 1987, two years after arriving in the United States, Long was sentenced to 9 to 12 years' imprisonment for manslaughter, kidnapping, and assault & battery with a dangerous weapon. *See* Draft PSR ¶ 46. He was 18 years old.

Long's April 1987 Massachusetts Department of Correction (DOC) initial classification

report described him as follows:

> Duong Long is serving his 1st commitment of any kind.  He has a lot of difficulty speaking English as he came to the United States from Vietnam only two years ago.  He is unsure of his age, thinking he is only 17 years old. He is very small physically and although convicted of a violent crime appears very vulnerable in this particular environment.  It is unclear how much he understands of English conversation.  He does seem to be able to handle himself without too much frustration.[2]

A November 15, 1988 DOC custody classification report noted that "Inmate Long maintains a low profile in the Unit.  Other than his D-report for a loud T.V., Long has presented no management issues.  He's quiet and appears eager to please.  Being of Amerasian descent, he has no readily available peer group but tries to co-exist with everyone.  He has an INS request to notify."

From his arrest on October 14, 1986 until his sentencing on April 7, 1987, Long was held at MCI Cedar Junction.  Following his sentencing, Long was incarcerated at MCI Concord, North Central Correctional Institution - Gardner, and MCI Lancaster until his release on parole on May 1, 1992.  While in minimum-security "pre-release" custody at MCI Lancaster, Long worked in a plastics factory.  On parole, he worked as a machine operator.  Long's parole was revoked after a few months, and he was reincarcerated at MCI Concord and Northeastern Correctional Center from October 6, 1992 until April 3, 1993, when he was released at age 24 after more than six years of incarceration.  Long worked consistently throughout his prison sentence, received good work reviews, was not a management concern, and had few visitors.

---

[2] Long's Massachusetts Department of Correction (DOC) records were requested by the defense and are on file with undersigned counsel.

DOC records also include the following notes:

- "Arrived in U.S. in March, 1985 at age 16. Uneducated and unable to get along with stepfather, Long lived on the street and was arrested 10-86."

- "Was living in Worcester with his Vietnamese mother and Vietnamese step-father. Subject was unable to co-exist with his step-father and subsequently began to live on the streets."

- "has little formal education.  As an Amerasian in Vietnam he was denied an Education. . . . Vocational skills and experience are limited to Rice Field work in Vietnam, Plastic Factor and Machine Operator Work."

Following his release from prison, Long continued to struggle with homelessness and drug addiction.  In his 20s and early 30s, Long "used cocaine, crack cocaine, heroin and marijuana on almost a daily basis," with his "heroin addiction" being the "most severe."  *See* Draft PSR ¶ 73. As someone without an education who was exposed to and became addicted to substances at a young age, Long was particularly vulnerable to continue using substances.  During this time Long incurred several more criminal convictions, all of which appear consistent with substance use disorder, homelessness, and poverty:  possession of burglarious weapons; larceny, breaking and entering at night; shoplifting; possession of a hypodermic needle or syringe.  *See id.* ¶¶ 47–50.

Despite these struggles, Long continued to work and live productively.  In the late 1990s, Long met and started living with Fianna Nguyen, his co-worker at a Bose Corporation factory, who became his common-law wife.  *See id.* ¶¶ 66, 86.  Long recalls that the two had a traditional Vietnamese marriage ceremony but were never legally married.  *See id.* ¶ 66.  The couple lived together for 15 years and had two children, Jessica Nguyen (born in 1998) and Jonathan Duong (born in 2003).  *See ibid.*

Long quit drugs other than alcohol and nicotine when his daughter was young and has been clean from drugs for more than 20 years.  *See id.* ¶ 73.  Long still suffers from alcohol use disorder.

*See id.* ¶ 74.  Long's alcoholism, and his discovery of his wife's infidelity, contributed to marital discord and a 2013 conviction for domestic violence.  *See id.* ¶¶ 51–52, 74.  Long maintains, and his children have corroborated, that he was never physically abusive to his wife.

The domestic violence conviction in turn led to deportation proceedings.  *See id.* ¶ 65. Because of when he left Vietnam, Long came to the United States as a refugee, not an immigrant, and is legally a citizen of Vietnam, and not the United States.  He has no lawful status in the United States.  So Long, despite having an American father, was summarily ordered deported.

The removal proceedings were unusually expedited (at least for the Northeast), and Long might not have been represented by counsel.  On December 22, 2014, Long was arrested and ordered detained by ICE.  *See* Exh. B (Dec. 22, 2013 DHS Notice of Custody Determination). On January 7 2015, only 16 days later, Immigration Judge Steven F. Day issued a final order of removal and Long waived his right to appeal.  *See* Exh. C (Jan. 7, 2015 EOIR Memorandum of Removal Order).  Long remained in ICE custody until March 11, 2015, when he was released pursuant to an Order of Supervision (OSUP) that remains in effect today.  *See* Exhs. D (Feb. 25, 2015 ICE Decision to Continue Decision) & E (Mar. 11, 2015 ICE Release Notification). He has not been in custody since.

Pursuant to a 2008 treaty between the United States and Vietnam, Vietnamese citizens who arrived in the United States before diplomatic relations were re-established between the two countries on July 12, 1995 are <u>not</u> subject to deportation to Vietnam.  *See* Agreement Between the United States of America and the Government of the Socialist Republic of Vietnam on the Acceptance of the Return of Vietnamese Citizens art. 2, ¶ 2, U.S.-Viet., Jan. 22, 2008, *available at*  https://www.govinfo.gov/content/pkg/GOVPUB-S-PURL-gpo34415/pdf/GOVPUB-S-PURL-gpo34415.pdf.  Therefore, although a final order of removal is in effect, Long is not at imminent

risk of deportation.  He periodically reports to ICE and has never been a compliance concern.  And, with a U.S. citizen father, he may yet have some path to citizenship.

After he was released from ICE custody in March 2015, Long lived with family for a time and then moved in with his co-defendant, Julie Miller.  *See* Draft PSR  ¶ 67.  Long lived with Julie during the 2017–2022 time period, including on January 6, 2021.  *See ibid.*  At times, when Long and Julie were not getting along well, Long would move out and stay for a while with his younger sister, HongHoa.  Long and Julie's relationship and cohabitation ended in 2022, when Long asked Julie to allow Long's daughter Jessica and Jessica's daughter to move in with them, and Julie refused.  Long moved into a shared room with his daughter and granddaughter, and, sometime in late 2022 or early 2023, they all moved into Jessica's current apartment.  *See id.* ¶ 64.

Long has always been a hard worker and has a robust employment record, having worked full-time consistently for his entire life.  *See id.* ¶¶ 79–86.  In particular, he has been employed as a factory worker for various electronic manufacturing companies for decades.  *See ibid.*  At the time of the offense, Long was employed as an operator with Mack Technologies in Westford, Massachusetts, earning $27.72 per hour.  *See id.* ¶ 79.  After years of continuous employment, months after his arrest in this case in June 2023, Long lost his job following an argument with his supervisor.  *See ibid.*

Long has endeavored to obtain employment but so far has been unable to find a new job.  *See id.* ¶ 78.  One significant obstacle has been his lack of a valid driver's license.  Long's driver's license expired on August 28, 2021, and he is required to pass a driver's test in order to get a new license.  So far in 2024, Long has taken and failed the written portion of the driver's test four times.  It is likely that Long will have to seek some special accommodation in order to pass the test and regain his license.

11

Without a job, Long recently became unable to contribute to the expenses for his household, which included himself, his daughter, and his daughter's young child.  *See id.* ¶ 64.  (Long's son Jonathan also lived with them in the apartment for several months during the summer of 2023. Jonathan moved out in September 2023 and Long lost his job soon thereafter.)  As a result, the rent and all other bills fell on Jessica.  *See id.* ¶ 66.  After some months of this arrangement, Jessica and Long had a falling out and she told him that he could no longer stay with her.

For the last several weeks, Long has slept on the couch of his co-defendant and former housemate, Julie Miller.  *See* ECF No. 34.  He continues to seek employment.

## II.    The Offense Conduct

Long Duong's case is not an isolated one.  Hundreds of defendants have been prosecuted, and trials are underway.  There are nearly too many cases to compare.  However, when the offense conduct is considered in totality and through the lens of Long's history and characteristics, this case falls clearly on one end of the spectrum.  Long's offense conduct is extraordinarily limited and, in combination with his intellectual disability, almost complete lack of education, and a lifetime of discrimination, makes him one of the least culpable of the many hundreds of defendants charged in the January 6, 2021 insurrection at the U.S. Capitol.

The offense conduct is accurately described in a detailed statement of offense executed by the defendant.  In essence, on January 4, 2021, Julie Miller drove from Massachusetts to Virginia in her car, and Long accompanied her.  The two checked in to a hotel in Northern Virginia.  At the hotel, Julie and Long decided to follow protesters who planned to attend President Trump's "Stop the Steal" rally in Washington, D.C. on January 6, 2021.

Julie and Long attended President Trump's speech and then walked with a large crowd toward the U.S. Capitol building.  At approximately 2:57 p.m., they entered the U.S. Capitol

through the Senate Fire Door.  They entered the Senate Parliamentarian's office space, where Julie sat down in a desk chair and Long took pictures of her on his phone.  They stayed in the Senate Parliamentarian's office space for several minutes before they were pushed out of the office by police and then pushed back out of the U.S. Capitol building through the Senate Fire Door. At approximately 3:12 p.m., Julie and Long re-entered the U.S. Capitol through the Senate Wing Door.  They stayed near the doors and took pictures until they were pushed out of that door by police.

Long was arrested on a sealed complaint on June 15, 2023.  Upon his arrest, Long immediately spoke with investigating authorities without the benefit of counsel and admitted to the offense conduct.  Long's first appearance in the District was on July 11, 2023.  He pled guilty on November 7, 2023.  He has fully acknowledged that he committed the offense conduct, including by agreeing to a lengthy offense stipulation.

The circumstances of January 6, 2021 arguably are among the most serious domestic events in the country's history.  The events that transpired that day were not among ones that Long foresaw or even contemplated.  Long has never been a U.S. citizen and has never voted in any U.S. election.  He has no awareness of politics and only a limited understanding of government, history, or law, a fact which was corroborated by every collateral contact by the Federal Defender Office.  Instead, Long is before the Court largely because of his susceptibility to the influence of others.  Long now recognizes the wrongness of his decisions and the Court can reasonably expect that he will not find himself in these circumstances again.

## III.   The Advisory Sentencing Guidelines and the Requested Sentence

On November 7, 2023, less than four months after his initial appearance, Long Duong pled guilty to one count of entering and remaining in a restricted building or grounds, in violation of

13

18 U.S.C. § 1752(a)(1).  *See* ECF No. 23.  Pursuant to the plea agreement, the parties stipulated to a Guidelines range of 0–6 months' imprisonment.  *See id.* at 4.

The defense respectfully requests that the Court impose a sentence of probation.  Although the defense is not seeking a departure or variance, the Court should consider that there are significant grounds for a downward departure or variance in this case, including based on the defendant's intellectual disability, which support the requested sentence of 12 months' probation.

## IV.    Argument

Long Duong's intellectual disability and extraordinary history of childhood trauma support a sentence of probation, and the sentencing factors under 18 U.S.C. § 3553(a) do not require a term of imprisonment.

### A.    *Long Duong's Intellectual Disability Supports a Sentence of Probation.*

The Court should impose a sentence of probation based on Long's intellectual disability. Federal Defender Office Research & Writing Attorney Dr. Kathryn Thomas administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) to Long in February 2024, and concluded that Long has a full-scale IQ of 63, an "extremely low" score in the 1st percentile. *See* Exh A (Apr. 3, 2024 Declaration of Dr. Kathryn Thomas, Ph.D., J.D., M.Ed) ("Thomas Decl."). Long's test results were as follows:

| Scale | Composite Score | 95% CI | Percentile Rank | Clinical Interpretation |
|---|---|---|---|---|
| Verbal Comprehension Index | 58 | 54-65 | .3 | Extremely Low |
| Perceptual Reasoning Index | 77 | 72-84 | 6 | Borderline |
| Working Memory Index | 71 | 66-80 | 3 | Borderline |
| Processing Speed Index | 65 | 60-77 | 1 | Extremely Low |
| Full Scale IQ (FSIQ) | 63 | 60-68 | 1 | Extremely Low |

Thomas Decl. ¶ 9.

Dr. Thomas summarized the IQ test results as follows:

> Overall, Mr. Duong's performance on the WAIS-IV demonstrates significant impairments across all cognitive domains, including verbal comprehension, perceptual reasoning, working memory, and processing speed. Although Mr. Duong demonstrated a relative strength in perceptual reasoning, his score still fell below 94 percent of people. Mr. Duong demonstrated a relative weakness in verbal comprehension, such that he scored below 99.7 percent of people. Mr. Duong's overall intellectual functioning, as measured by his FSIQ, fell below 99 percent of people.

*Id.* ¶ 15.  Long's "lowest subscore" is in "Verbal Comprehension," making this a "relative weakness." *Id.* ¶ 11.  Dr. Thomas explains that Long's low verbal comprehension "is consistent with Mr. Duong's self-report that he did not attend school throughout his childhood in Vietnam, and only attended school for a few months around the age of 15 after immigrating to the United States, as formal education has a significant impact on Verbal Comprehension abilities." *Ibid.*

Long's sister Nga explained his intellectual disability to the defense team as follows: "His mind is more of like a child. A teenage mind. He doesn't understand things. . . . He doesn't have any mental illness or anything like that. I know that. He understands he's supposed to help his family. **But he just can't comprehend things.**"

The courts have recognized the importance of a defendant's intellectual limitations in sentencing. The United States Supreme Court has recognized that "impaired intellectual functioning is inherently mitigating." *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (O'Connor, J.). *See also Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (Stevens, J.) ("Mentally retarded persons . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . . Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."); *Penry v. Lynaugh*,

492 U.S. 302, 322 (1989) (O'Connor, J.) (mental retardation may render a defendant "less morally culpable than defendant who have no such excuse" (internal quotation marks and citation omitted)).

The defense is seeking a sentence of probation, and is not seeking a downward departure or variance from the Guidelines.  In considering the types of sentence available, however, the Court should consider that courts frequently depart downward or impose non-Guidelines sentences for defendants with low IQs pursuant to U.S.S.G. § 5K2.13, § 5H1.3, or § 5K2.0, or 18 U.S.C. § 3553(a).[3]   Guidelines Section 5K2.13 expressly authorizes a downward departure "if the

---

[3] *See, e.g.*, *United States v. Blair*, 565 F. App'x 548 (7th Cir. 2013) (affirming non-Guidelines sentence where trial court's variance was based on defendant's "mental retardation" and "[a]ll other factors suggest a higher sentence"); *United States v. Watson*, No. 15-CR-0287 (WFK), 2019 WL 396874 (E.D.N.Y. 2019) (court sentenced bank fraud defendant with IQ scores of 60 and 66 to below-Guidelines sentence in consideration of § 5K2.13); *United States v. Piggott*, No. 2:14-CR-124 (MHT), 2015 WL 1894319 (M.D. Ala. 2015) (court imposed below-Guidelines sentence where defendant had an IQ in the mid-70s because the defendant was "*in many ways like a child* in his ability to grasp the consequences of his actions"); *United States v. Rothwell*, 847 F. Supp. 2d 1048 (E.D. Tenn. 2012) (granting 8-level downward departure based on mental condition under § 5H1.3 where defendant had a full scale IQ of 77); *United States v. Meillier*, 650 F. Supp. 2d 887 (D. Minn. 2009) (varying from a range of 57-to-71 months' imprisonment to 1 day in custody because defendant, with an IQ of 70, was, "intellectually speaking, an eleven-and-a-half-year-old boy"); *United States v. Tunnell*, Case Nos. 6:08-CR-00010, 6:08-CR-00028, 2009 WL 256280 (W.D. Va. Feb. 3, 2009) (court imposed below-Guideline sentence for defendant with "low-average" IQ of 85 whose development was impaired as an infant by spinal meningitis); *United States v. Santa*, No. 05-CR-649, 2008 WL 2065560 (E.D.N.Y. May 14, 2008) (granting 8-level downward departure based on diminished capacity under § 5K2.13 where defendant "has a full scale IQ of 58" and psychologist found that defendant has "significant deficits in judgment due to his low IQ"); *United States v. Gonzalez*, No. 03-CR-0285 (RWS), 2004 WL 230992 (S.D.N.Y. Feb. 5, 2004) (granting 2-level downward departure where psychiatry report concluded that defendant "was born with cognitive deficits" and defendant's "intellectual capacities, thinking and judgment are and have always been significantly impaired"); *United States v. Allen*, 250 F. Supp. 2d 317 (S.D.N.Y. 2002) (granting 8-level downward departure under § 5K2.0 where "defendant's full scale IQ was 94 while subtest scores ranged from mildly mentally retarded to average" and psychologist's report concluded that defendant's "overall judgment or common sense falls between the borderline and the low average range," taking the case outside the heartland); *United States v. Mena*, 968 F. Supp. 115 (E.D.N.Y. 1997) (granting 15-level downward departure based in part on diminished capacity under § 5K2.13 where defendant had a full scale IQ of 67

defendant committed the offense while suffering from a significantly reduced mental capacity." Diminished capacity is an exception to the general rule that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable range." U.S.S.G. § 5H1.3 (referring to subpart 5K2 as containing exceptions to the general rule).

"A finding of diminished mental capacity does not necessarily mean that a defendant lacked criminal intent." *United States v. Zedner*, 401 F.3d 36, 52 (2d Cir. 2005), *overruled on other grounds*, 547 U.S. 489 (2006). "The defendant could have acted with criminal intent so as to be guilty of the crime, while at the same time suffering from a diminished mental capacity that would justify departure." *Id.* at 52–53. "The standard here for granting a downward departure on the basis for diminished mental capacity is not that the defendant recognizes the difference between right and wrong, which may negate intent, but rather that his diminished mental capacity significantly *impaired* his judgment or his ability to understand the wrongfulness of his actions." *United States v. Valdez*, 426 F.3d 178, 184 (2d Cir. 2005) (emphasis in original). "Though Defendant's significantly reduced mental capacity must be a contributing

---

and "falls within the mildly mentally retarded range of intellectual functioning"); *United States v. Blackwell*, 897 F. Supp. 586 (D.D.C. 1995) (granting downward departure based in part on diminished capacity under § 5K2.13 where "defendant has an IQ of no more than 75 and is at the borderline between intelligence and retardation"); *United States v. Cotto*, 793 F. Supp. 64 (E.D.N.Y. 1992) (defendant's near-mental retardation, vulnerability, efforts at rehabilitation and incompetence in the execution of the crime warranted 4-level downward departure); *United States v. Adonis*, 744 F. Supp. 336 (D.D.C. 1990) (granting downward departure based on diminished capacity under § 5K2.13 where defendant's IQ of 64 placed him in the lowest one percent of the United States population). *See also, e.g., United States v. Knott*, -- F. Supp. 3d ----, 2022 WL 16571169 (M.D. Al. Nov. 1, 2022) (fact that defendant's autism spectrum disorder would render him extraordinarily vulnerable to abuse in prison weighed in favor of granting downward variance from recommended sentence of 27 months of incarceration to 27 months of home confinement).

cause of the offense, it need not be the sole cause of the offense." *United States v. Watson*, No. 15-CR-0287-23 (WFK), 2019 WL 396874, at *6 (E.D.N.Y. Jan. 31, 2019).

In this case, Long has "significant impairments across all cognitive domains, including verbal comprehension, perpetual reasoning, working memory, and processing speed." Thomas Decl. ¶ 15. Long's understanding of the events of January 6, 2021 is limited. Long acknowledges and understands that he is guilty, and that it was wrong and unlawful for him to enter and reenter the Capitol building. But his comprehension does not extend far beyond the elements of the offense. Long has no political awareness or understanding of Donald Trump or any other politician. Due to his intellectual disability, Long was highly susceptible to the influence of others, including his co-defendant who drove them to Virginia, the would-be protesters they met at the hotel, and the mob of people whom they queued up behind and followed into the Capitol. Long's participation in the offense conduct was not his idea. He was in many respects a passenger, there along for the ride.

Long's full-scale IQ of 63 supports a sentence of probation.

**B.      *Long Duong's Extraordinary History of Trauma Supports a Sentence of Probation.***

Long's intellectual disability is likely related to the extraordinary abuse and neglect that he experienced as a child. In particular, Long experienced childhood and adolescent exposure to trauma in the form of being part of a unique underclass resulting from the war; the many other horrors of war and post-war on the home front; food insecurity and deprivation; the complete absence of a father; physical and emotional abuse from the very people meant to care for him, as well as from strangers; prolonged homelessness; early exposure to substance abuse; and no education or schooling. This prefect storm of adverse childhood experiences must have affected Long's brain development. As Dr. Nadine Burke Harris, former Surgeon General of California,

has explained:

> Toxic stress response can occur when a child experiences strong, frequent, and/or prolonged adversity—such as physical or emotional abuse, neglect, caregiver substance abuse or mental illness, exposure to violence, and/or the accumulated burdens of family economic hardship—without adequate adult support.  This kind of prolonged activation of the stress-response systems can disrupt the development of brain architecture and other organ systems, and increase the risk for stress-related disease and cognitive impairment, well into the adult years.

NADINE BURKE HARRIS, THE DEEPEST WELL: HEALING THE LONG-TERM EFFECTS OF CHILDHOOD ADVERSITY 54–55 (2019).  Long's life circumstances consistently triggered this "toxic stress response," leading to "chronic dysregulation of the stress-response system, which inhibited the prefrontal cortex, overstimulated the amygdala, and short-circuited the stress thermostat."  *Id.* at 61.

As explained by Dr. Harris, "[t]he past several decades of neuroscience research explains why early adversity has such an outsize impact on children's development.  The prenatal and early childhood periods offer special windows of opportunity because they represent 'critical and sensitive' periods of development."  *Id.* at 144.  "Critical and sensitive periods are times of maximal neuroplasticity (the brain's ability to rewire or reorganize itself in response to a stimulus)."  *Id.* at 145.  "We know that early adversity activates the brain pathways that are associated with vigilance, poor impulse control, increased fear, and inhibition of executive functioning."  *Id.* at 146.

### C.     The Section 3553 Factors Support a Sentence of Probation.

A probation sentence achieves just punishment and is sufficient to promote respect for the law in this case.  The offense of conviction is a serious one, but one that has resulted in a sentence of probation for many defendants.  Long is less culpable than many of these defendants, including because his offense conduct features minimal involvement in the riot, a total lack of preplanning,

and a total absence of aggravating factors.  See cases cited in Defendant Julie Miller's Sentencing Memorandum, ECF No. 36, at 5–7.  Long is also less culpable than many defendants who have received sentences of probation for the reason of his intellectual disability, cognitive deficiencies, susceptibility to the influence of others, and lack of any political opinions of his own.  Notably, and uniquely, Long is not a Donald Trump supporter and has no political awareness or understanding of Donald Trump or any other politician.

A prison sentence is not necessary to accomplish specific deterrence or to protect the public from Long.  According to available social science data, "the available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."  Ellen Raaijmakers, *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism:  A Neglected Element in Testing Deterrence Theory*, 54 J. RES. CRIME & DELINQUENCY 1, 4 (2017).  Further, there is no empirical evidence to suggest that Long's dated criminal record, related to substance abuse issues that he has overcome, requires a term of imprisonment as a necessary deterrent.  Indeed, "[t]o our knowledge, there is no rigorous empirical study of whether, among second-time felons, tougher types of sanctions than what the individuals previously received results in the specific deterrent effect anticipated under contemporary sentencing schemes.  Put differently, little evidence exists that a 'recidivist sentencing premium' (Roberts 2008:468) reduces recidivism."  Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, 54 J. RES. CRIME & DELINQUENCY 24 (2017).

As for general deterrence, it is the fact of Long's conviction and not the magnitude of his punishment that matters.  As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no

convincing evidence suggesting that harsher sentences deter."  Cheryl Marie Webster, *et al.*, *Searching for Sasquatch: Deterrence of Crime Through Sentence Severity*, *in* THE OXFORD HANDBOOK ON SENTENCING AND CORRECTIONS 173–195, 176 (2012).

> We share the view of deterrence theory expressed by Danielle Sered:

> Deterrence theory assumes the existence of a set of circumstances that do not exist.  To begin with, it assumes a level of civic knowledge and awareness—that everybody knows what the consequences are for a given crime.  Increasing the length of sentences does not work to motivate change if no one knows that those sentences have changed.  As a culture, we simply do not possess that level of knowledge or awareness.  Nor do people typically learn about their peers' or neighbors' sentences with enough context to anticipate the consequences of their own actions.

DANIELLE SERED, UNTIL WE RECKON 61 (2019).

The last statutory factor, the goal of rehabilitation, can best be met with a sentence of probation.  Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  This purpose militates strongly against any time in prison.  Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).  In this case, the goal of rehabilitation is better served by probation that prison.

In considering a probation sentence, it is noteworthy that Long has taken concrete steps to improve his life while on pretrial release.  With the assistance of the defense team, Long enrolled in MassHealth, the public health insurance program for low-income Massachusetts residents, in December 2023, and since February 2024 has been seeing a primary care physician at Grace Medical in Worcester.  This is the first time Long has regularly seen a primary care physician in over a decade.  Given Long's history of cardiovascular and respiratory issues, this is a significant

life development. Despite suffering a pulmonary embolism in 2017, Long had stopped taking Elliquis (apixaban), an anticoagulant medication, years ago, due to the high co-pay for the medication associated with health care offered through his employer. Now that he is on MassHealth, Long is prescribed and regularly taking Elliquis, as well as both a fibrate and a statin to help control his high cholesterol, and nicotine patches to help him quit smoking.[4]

Long also recently received his Massachusetts Identification Card. He is working toward regaining his driver's license, including by having recently taken (and failed) the written portion of the exam four times. He has strengthened his relationship with many family members and established a more open and communicative relationship with his several half-siblings who also live in Worcester. He has prepared a resume and sought employment. Although his relationship with his children has been bumpy at times, in part due to his relationship with his co-defendant, and recently due to this criminal case and his loss of employment, there is room for improvement and a real opportunity for repair there.

It is likely that Long can go on to accomplish much more under the capable supervision of the U.S. Probation Office during a term of probation. For example, Long would likely benefit from employment referral assistance, trauma-informed mental health treatment, cognitive behavioral therapy, and alcohol use disorder treatment, all of which would be more effective than prison time in reducing the risk of recidivism.

---

[4] Long's records from Grace Medical, and Long's records from Saint Vincent's Hospital concerning his 2017 pulmonary embolism, were requested by the defense, are on file with undersigned counsel, and have been provided to the U.S. Probation Office.

## V.      Conclusion

For the reasons discussed in this memorandum, in addition to any others deemed appropriate by the Court, Mr. Long Duong respectfully requests that the Court impose a sentence of 12 months' probation and order restitution of $500 to the Architect of the Capitol.

Respectfully Submitted,

THE DEFENDANT,
Long Duong

OFFICE OF THE FEDERAL DEFENDER
FOR THE DISTRICT OF CONNECTICUT

Date:  April 10, 2024                  */s/ Andrew P. Giering*
Andrew P. Giering
Assistant Federal Defender
10 Columbus Boulevard, Floor 6
Hartford, CT 06106
Tel: (860) 493-6260
Fax: (860) 493-6269
Email: Andrew_Giering@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 10, 2024, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Andrew P. Giering*
Andrew P. Giering