UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 1:23-CR-219 (DLF) |
| vs. | : | |
| LONG DUONG | : | April 15, 2024 |

**SENTENCING REPLY MEMORANDUM**

Mr. Long Duong respectfully submits this reply memorandum in response to the government's April 10, 2024 sentencing memorandum (ECF No. 35), and to provide the Court with additional information in anticipation of his sentencing hearing on April 26, 2024.

**I.      Prison is Not Necessary in this Case**

The government requests a sentence of 60 days' imprisonment for Long Duong. *See id.* at 1. A prison sentence for Long would result in unwarranted sentencing disparities, as many January 6th defendants convicted of the same offense who were much more culpable than Long have received sentences of probation. A prison sentence would also fail to adequately take into account Mr. Duong's intellectual disability, which is an extraordinary and inherently mitigating characteristic.

The government's two comparator cases for Long Duong (*see id.* at 18) are poor comparisons. According to the government's sentencing memorandum in James Bonet's case, the government sought a 45-day prison sentence for Bonet because:

> (1) Bonet smoked what appears to be marijuana in a Senator's private office and broadcast it on social media and (2) Bonet's social media messages show that his unlawful presence in the Capitol was part of an intentional desire to forcefully "tak[e] our country back"; after calling police battling rioters "pieces of shit" and advancing to an entrance to the Capitol, he declared: "[w]e made it in the building bitches! We're taking it back! We are taking it back, we made it in the building!" In addition, Bonet saw numerous red flags as he approached the entrance to the Capitol that told him to turn back. He did not.

Government's Sentencing Memorandum at 1–2, *United States v. Bonet*, No. 1:21-CR-121 (EGS), ECF No. 45 (D.D.C. Jan. 10, 2022). Unlike with Bonet, Long's unlawful presence in the Capitol was not part of any "desire to forcefully 'tak[e] our country back.'" For defense counsel, having come to know Long well, it is amusing to imagine the absurdity of Long livestreaming himself while smoking a joint in a Senator's "hideaway" office. It is less amusing, but equally unbelievable, to imagine Long ever denigrating a police officer.

Kasey Hopkins's case has superficial similarities to Long's, in that both behaved respectfully during their few minutes inside the Capitol, and both were convicted of a serious felony offense more than 20 years ago (Hopkins in 2002, Duong in 1987). However, a closer look shows that Hopkins traveled to Washington, D.C. with very different intentions than Long: "Prior to traveling, on January 3, 2021, Hopkins solicited another individual (Person 1) to travel with him and discussed the potential of a 'Civil War.' He even proposed forming a group of 'Proud Felons for Trump' when he heard the Proud Boys might not accept men with felony convictions." Government's Sentencing Memorandum at 2, *United States v. Hopkins*, No. 1:22-CR-317 (TSC), ECF No. 31 (D.D.C. Apr. 3, 2023). It is a critical and distinguishing fact that Hopkins and many, many other January 6th defendants were Donald Trump supporters who, motivated by the "Big Lie" that Trump had won the election, traveled to Washington, D.C. to attend the "Stop the Steal" rally – but Long was not. *See* Final PSR ¶¶ 23, 32.

Although there are almost too many cases to compare, the defense highlights the following cases in which the defendant was sentenced to probation (without home detention) for violating 18 U.S.C. § 1752(a)(1), to show how Long's offense conduct, in combination with his history and characteristics, cannot support a prison sentence.

### *Verden Andrew Nalley*

On March 10, 2022, the Court sentenced Verden Andrew Nalley to 24 months' probation for

2

a violation of 18 U.S.C. § 1752(a)(1). *See* Judgment, *United States v. Nalley*, No. 1:21-CR-116 (DLF), ECF No. 97 (D.D.C. Mar. 10, 2022). Nalley penetrated far deeper into the Capitol than Long did, including the crypt and rotunda, and remained there much longer, for 30 to 40 minutes. *See* Government's Memorandum at 3–7, *United States v. Nalley*, No. 1:21-CR-116 (DLF), ECF No. 93 (D.D.C. Mar. 3, 2022). Two days later, on January 8, 2024, Nalley discussed returning to the Capitol (with guns) on social media. *See id.* at 7. At 8:40 AM, Nalley posted that "if we have to come back we will bring guns and take our country from them." *See ibid.* At 10:05 AM, he posted that "[w]e took it with no weapons and we will be back with guns in two weeks if it's not fixed." *See id.* at 8. Mr. Nalley's sentencing memorandum, filed publicly, does not indicate any mitigating circumstance nearly as significant of Mr. Duong's IQ of 63.

### *Other § 1752(a)(1) Probation Cases*

The following sentences in other Section 1752(a)(1) cases similarly indicate how excessive and unfair a prison sentence would be for Long Duong in this case. The citations are to the judgments, and the quotes and information in the parentheticals (other than the sentences) are from the government's sentencing memoranda. *See* Judgment, *United States v. Boulton*, No. 1:23-CR-284 (JDB), ECF No. 31 (D.D.C. Feb. 9, 2024) (Bates, J.) (24 months' probation for defendant who "posted numerous TikTok videos after January 6 in which he advocated for additional political violence and minimized the actions of the rioters" and "gave an interview to a newspaper reporter in which he stated that this case would result in just 'a slap on the wrist'"); Judgment, *United States v. Lebrun*, No. 1:22-CR-136 (JMC), ECF No. 64 (D.D.C. Jan. 31, 2024) (Cobb, J.) (24 months' probation for "35-year-old bounty hunter/bail bondsman and former Marine" who wore a "tactical vest," joined the "Proud Boys" in "fighting with Black Lives Matter supporters," "participat[ed] in the first breaches of police lines on the West side of the Capitol," "r[an] under scaffolding and up the stairs to the Upper

3

West Terrace," and "ent[ered] into the Capitol by climbing through a broken window that had been shattered right in front of him"); Judgment, *United States v. Hall*, No. 1:23-CR-246, ECF No. 36 (JMC) (D.D.C. Dec. 11, 2023) (Cobb, J.) (12 months' probation for defendant who brought a painters mask to Washington, D.C. and climbed a railing to enter the Capitol and yell at police officers after being pepper-sprayed); Judgment, *United States v. Brooks*, No. 1:22-CR-18 (JMC), ECF No. 40 (D.D.C. Nov. 3, 2022) (Cobb, J.) (12 months' probation for defendant who brought "tear gas, a camouflage body armor vest and a two-way radio to Washington, D.C.," "climbed railings in order to access the Capitol," "gave a television interview that disclaimed responsibility," "had verbal altercations with police officers on the Capitol grounds where he waived [sic] a military ballcap at officers," and "remained at the Capitol for at least 2 and one-half hours"); Judgment, *United States v. Cudd*, No. 1:21-CR-68 (TNM), ECF No. 97 (D.D.C. Mar. 24, 2022) (McFadden, J.) (two months' probation for defendant who "wore a bulletproof sweatshirt to the riot," "crossed overturned bike racks and scaled a wall to get to the Capitol," "engaged in a self-described push against law enforcement officers while yelling 'go' and 'charge' to reach the entrance of the U.S. Capitol building," and told an interviewer days later that they "would absolutely do it again"); Judgment, *United States v. Pert*, No. 1:21-CR-139 (TNM), ECF No. 59 (D.D.C. Dec. 21, 2021) (McFadden, J.) (24 months' probation for defendant whose statements on contemporaneous Facebook Live video made clear that they had come to D.C. to "stop the vote," *i.e.*, to prevent the certification of the 2020 Electoral College vote count); Judgment, *United States v. Witcher*, No. 1:21-CR-235 (RC), ECF No. 48 (D.D.C. Feb. 7, 2022) (Contreras, J.) (12 months' probation for defendant who recorded himself shouting at law enforcement, "Don't be a traitor!  Fulfill your constitutional duties, man. Do or die!"); Judgment, *United States v. Cordon*, No. 1:21-CR-277 (TNM), ECF No. 40 (D.D.C. Nov. 18, 2021) (McFadden, J.) (12 months' probation for defendant who entered the Capitol

4

"by climbing through a broken window" wearing a "vest of body armor and a gas mask," "draped an American flag over his shoulders as if it was a cape," and, after leaving the building, told a reporter, "We're standing up and we're taking our country back.  This is just the beginning.").

**II.      The Limited Nature of the Offense**

The videos provided by the government crystallize why the nature and circumstances of the offense do not support a prison sentence.

Video #1 depicts Long and co-defendant Julie Miller waiting patiently in a queue to enter the Capitol.  Julie is heard chanting.  Long is not.

Video #2 depicts Long and Julie entering the Senate fire doors at 2:35, and entering the open door immediately ahead on their right at 3:00.  Long did not travel far into the Capitol, did not search out any particular space, did not know that this particular door (the closest door to the entrance) led to the Senate Parliamentarian's Office, and had no comprehension of the distinction between public spaces and a "private office" emphasized in the government's memorandum (*see* ECF No. 35 at 2, 12, 17, 18).

In Video #3, starting at 1:48, Long and Julie are depicted hurrying out of the Senate Parliamentarian's Office and toward the fire doors, apparently following the instructions of law enforcement.  When they rush out of the office at 1:48, they are already on their way to the fire doors.  They are at the doorway by 2:00, clearly past the doors and out of the building by 2:04, and out of frame by 2:08.

Long agreed in his offense stipulation he and Julie "were pushed out of the office by police and were then pushed back out of the U.S. Capitol building through the Senate Fire Door." *See also* Final PSR ¶ 38 (Long and Miller "were pushed out of the office by police and were then pushed back out of the US Capitol building through the Senate Fire Door.").  The evidence submitted

5

by the government suggests that this pushing was figurative, not literal; it appears that Long and Julie were told to leave, and perhaps were herded out, but were not physically pushed out. When Long and Julie come into frame at 1:48, they appear to be rushing out of the Senate Parliamentarian's Office at the direction of officers, but it does not appear that they are being pushed. Immediately after Julie and Long leave the office, the next person out is another protester, who *is* depicted being pushed by a police officer at 1:51. Long and Julie are fully captured on video from the time when they leave the Senate Parliamentarian's Office until when they leave the building, and at no time are they depicted having any physical contact with any officer.

The distinction is significant because the government repeatedly emphasizes that Long and Julie were "pushed out" of the Capitol by police (*see* ECF No. 35 at 2, 5, 6, 15; ECF No. 35-1 at 2), and that, "despite being pushed out of the Capitol by police," they "chose to enter the Capitol building a second time." *See* ECF No. 35 at 2; *see also id.* at 15 ("After being pushed out of the Capitol by police, they entered a second time. A term of imprisonment is necessary to encourage both to abide by the law."). The Court should consider that this pushing was figurative, not literal, as it appears that physical force was not required to remove Long or Julie from the Capitol.

For these and many other reasons, the seriousness of Long's offense pales in comparison to almost all other January 6th defendants, including numerous defendants who have received sentences of probation.

**III.   The Proposed Treatment Plan**

Instead of a prison sentence, the defense requests that the Court provide for the implementation of the Comprehensive Support/Treatment Plan submitted as Exhibit H to this memorandum, the lynchpin of which is Long's participation in the 7–9-month in-patient residential treatment program at the Salvation Army Adult Rehabilitation program in Springfield, Massachusetts.

This plan is the most certain way to promote the goals of sentencing, especially the goals of specific deterrence and rehabilitation.

Should the Court agree that a term of imprisonment is not necessary to meet the purposes of sentencing in this case, Long stands ready to immediately enter the Salvation Army program, where he can expect to spend at least 6 months receiving the alcohol use disorder treatment, substance use disorder relapse prevention treatment, employment assistance, moral guidance, structure, and support that he requires.

The Salvation Army is among the hardest programs, if not the hardest program, available in Long's home state of Massachusetts, or even in the region.  It is not for people who only want to get sober; it is for people who also want to change their lives.  Many participants do not graduate the program.  The program typically runs seven to nine months.

There are four phases:

- **Phase 1:  Orientation** – during the first 30 days there are no visitors, outside calls, or outside appointments.  Participants are expected to make use of all program opportunities offered, including church and work therapy.

- **Phase 2:  Education** – participants must attend two or more outside support meetings such as AA/NA.  Participants are strongly encouraged to find a sponsor or mentor who has overcome similar problems.  Participants must participate in work therapy, church, and all scheduled program opportunities.

- **Phase 3:  Development** – participants must have a sponsor.  Participants must find a place of worship.  Participants must attend a minimum of three outside support meetings, in addition to participating in on-site groups, work therapy and church.

- **Phase 4:  Reinforcement** – participants must create and have approved a "Transition Plan."  A participant must complete seven weeks in Phase 4 prior to conducting a work search.  Graduation objectives include securing employment, housing, and post-graduation support.

The Salvation Army program uses the following components:

- Work Therapy

7

- Religious Activities
- Residence
- Counseling
- Recreation

Exh. I (Salvation Army materials).

On April 9, 2024, the Federal Defender Office submitted a referral for Long to apply to the Salvation Army Adult Rehabilitation program in Springfield, Massachusetts. On April 11, 2024, Long completed a screening for the Salvation Army program. He was accepted to the Salvation Army program the next day. An admissions letter was provided today, April 15, 2024, confirming a bed would be available for Long on or before April 26, 2024, the date of sentencing. Exh. J.

The Court could require that Long participate in, and successfully graduate from, the Salvation Army program as a special condition of supervision. This would do much more than prison to reduce any risk of recidivism and to promote the sentencing goal of rehabilitation.

## IV. Conclusion

No term of imprisonment would be reasonable in this case for Long Duong, a non-U.S. citizen who is intellectually disabled, has no recent criminal convictions, and, in his family's understated, factual words, is a "very, very hardworking person" who "has had a hard life throughout his life" and "has never been involved in any politics or [can] comprehend it." Exhs. F & G. A probationary sentence would provide just punishment, provide adequate deterrence to Long, avoid unwarranted sentencing disparities with other January 6th defendants, and is entirely warranted in the light of Long's history and characteristics.

                                       Respectfully Submitted,

                                       THE DEFENDANT,
                                       Long Duong

                                       OFFICE OF THE FEDERAL DEFENDER
                                       FOR THE DISTRICT OF CONNECTICUT

Date: April 15, 2024                */s/ Andrew P. Giering*
                                       Andrew P. Giering
                                       Assistant Federal Defender
                                       10 Columbus Boulevard, Floor 6
                                       Hartford, CT 06106
                                       Tel: (860) 493-6260
                                       Fax: (860) 493-6269
                                       Email: Andrew_Giering@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 15, 2024, a copy of the foregoing Sentencing Reply Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Andrew P. Giering*
Andrew P. Giering